# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

COLUMBIA GAS TRANSMISSION, LLC,　　　　*

　　　　　　*Plaintiff*,　　　　　　　　　*

　　　　v.　　　　　　　　　　　　　　　　*

0.12 ACRES OF LAND, MORE OR LESS,　　　　　　No. 1:19-cv-01444-GLR
IN WASHINGTON COUNTY,　　　　　　　　*
MARYLAND; STATE OF MARYLAND,
DEPARTMENT OF NATURAL　　　　　　　*
RESOURCES,
　　　　　　　　　　　　　　　　　　*
　　　　　　*Defendants*.

　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Defendants, the State of Maryland, Department of Natural Resources ("the State" or "MDNR"), oppose plaintiff Columbia Gas Transmission, LLC's ("Columbia") motion for preliminary injunction (ECF 2) because Columbia has failed to meet the four mandatory requirements for obtaining a preliminary injunction: (1) that it is likely to succeed on the merits, (2) that it will suffer irreparable harm if the preliminary injunction is denied, (3) that the balance of equities favor the grant of a preliminary injunction, and (4) that the grant of a preliminary injunction serves the public interest.

## PERTINENT FACTUAL ALLEGATIONS

The complaint alleges the following facts: Columbia is a Delaware limited liability company authorized to do business in the State of Maryland. Complaint in Condemnation (ECF 1, "Compl."), ¶ 1. Columbia's business is the transport of natural gas in interstate

commerce through pipes and conduits; it is a natural gas company within the meaning of the Natural Gas Act, 15 U.S.C. §§ 717a(6) and (1). Compl. ¶ 2.

On July 19, 2018, the Federal Energy Regulatory Commission ("FERC") granted Columbia a certificate of public convenience and necessity ("CPCN") approving the construction and operation of approximately 3.37 miles of 8-inch diameter natural gas pipeline, extending from existing pipeline in Fulton County, Pennsylvania, to a site in Morgan County, West Virginia. Compl. ¶¶ 7, 8. FERC has approved the route of the project, Compl. ¶ 12, and the certificate facially authorizes Columbia to exercise "the right of eminent domain" to effectuate the route, Compl. ¶¶ 11-13, 25.

The project route impacts 22 tracts of real property. Compl. ¶ 14. Columbia has negotiated voluntary acquisition of easements through 18 privately-owned tracts. *Id.* Columbia has not, however, obtained easements for at least four parcels of publicly owned land. Three of those parcels are owned by the federal government and managed by the National Park Service in connection with the Chesapeake & Ohio Canal National Historical Park. *Id.* The fourth tract, which is the subject of this condemnation action ("the Tract"), is owned by the State of Maryland to the use of the Department of Natural Resources as a rails-to-trail bike path. Compl. ¶¶ 3, 14; Md. Code Ann., Nat. Res. § 1-109(a)(2).

## ARGUMENT

A preliminary injunction is "'an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.'" *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 188 (4th Cir. 2013) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir.

1991)).  To obtain a preliminary injunction, a "movant 'must establish [1] that he is likely to succeed on the merits [of his claim], [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Id.* (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).  A movant must meet the requirements of all four prongs of the test to prevail on a motion for preliminary injunction.  *Real Truth About Obama, Inc. v. Federal Election Com'n*, 575 F.3d 342, 346 (4th Cir. 2009).  Columbia's motion should be denied because it fails to satisfy this test.

## I.  COLUMBIA HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE ISSUE OF THE STATE'S ELEVENTH AMENDMENT IMMUNITY AGAINST SUIT IN FEDERAL COURT.

Columbia cannot succeed on the merits of its claim because it is barred by the State of Maryland's sovereign immunity.[1]  Immunity from suit is a fundamental aspect of sovereignty.  *Alden v. Maine*, 527 U.S. 706, 713 (1999).  Upon the formation of the United States, the States retained their status as sovereign entities and thereby retained their immunity from suit.  *Id.*  Under the Eleventh Amendment, a state's immunity from suit limits federal court jurisdiction.  *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363-64 (2001).  By its terms,[2] the Eleventh Amendment explicitly applies to suits like

---

[1] This discussion of Columbia's likelihood of success on the merits is identical to the discussion of the State's Eleventh Amendment immunity that appears in the State's memorandum in support of its motion to dismiss.

[2] "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI.

this one, which is brought against a state by citizens of another state. Columbia is a business organized under the laws of Delaware pursuing litigation against the State of Maryland. Compl. ¶ 1. Moreover, the Supreme Court has "extended the Amendment's applicability to suits by citizens against their own States." *Id.* In other words, the Eleventh Amendment bars federal jurisdiction over suits by any private citizen against a state. *Jachetta v. United States*, 653 F.3d 898, 908 (9th Cir. 2011). Furthermore, the State's immunity extends to state agencies such as MDNR.[3] *See Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244, 248 (4th Cir. 2012) (recognizing that immunity extends to state agents and state instrumentalities).

The Eleventh Amendment bar to suit is subject to three exceptions not applicable here: (1) where the State has consented to suit, *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991); (2) where Congress has abrogated the State's immunity pursuant to a valid grant of constitutional authority, *Garrett,* 531 U.S. at 363; and (3) where the suit seeks prospective injunctive relief against state officials acting in violation of federal law, *Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 437 (2004) (citing *Ex parte Young,* 209 U.S. 123 (1908)).

The third of these exceptions does not apply because this suit is not an action against state officials for alleged violations of law. It is a condemnation suit by a private party arising under the Natural Gas Act, 15 U.S.C. §§ 717-717z ("NGA"). As developed below,

---

[3] MDNR is a principal department of Maryland State government. Md. Code Ann., Nat. Res. § 1-101(a) (LexisNexis 2018).

neither the first nor second exception applies either: the State has not consented to such suits, and Congress has not abrogated the State's immunity from such suits.

### A. The State Has Not Consented to Suits For Condemnation By Private Parties.

The State cannot be subject to suit in federal court unless it "consented to suit, either expressly or in the 'plan of the [Constitutional] convention.'" *Blatchford*, 501 U.S. at 779 (citation omitted); *cf. Lapides v. Board of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002) (holding that a state may waive Eleventh Amendment immunity by voluntarily availing itself of federal forum). There is no allegation that MDNR has consented to this suit, either expressly or by affirmative conduct, and consent is not implicit in the plan of the convention. Although, "[i]n ratifying the Constitution, the States consented to suits brought by other States or by the Federal Government," *Alden*, 527 U.S. at 755, the consent to suit by the United States "is not consent to suit by anyone whom the United States might select." *Blatchford*, 501 U.S. at 785; *see Alden*, 527 U.S. at 756 (observing that "[s]uits brought by the United States itself require the exercise of political responsibility for each suit prosecuted against a State, a control which is absent from a broad delegation to private persons to sue nonconsenting States"). Consequently, although the federal government could pursue a condemnation action against the State in federal court, it has no authority to assign its Eleventh Amendment exemption to a private party like Columbia.

Significantly, the complaint alleges only that the federal government delegated its eminent domain authority to Columbia, not that it assigned its Eleventh Amendment exemption. Compl. ¶¶ 11, 25. Nor could Columbia have alleged such an assignment

because the federal government's Eleventh Amendment exemption is a permission granted

*by the states*—it is not the federal government's to give. The consent granted by the states

to the federal government cannot be redelegated to private pipeline companies like

Columbia. As the Supreme Court observed in *Blatchford*:

> We doubt, to begin with, that that sovereign exemption *can* be delegated—
> even if one limits the permissibility of delegation (as respondents propose)
> to persons on whose behalf the United States itself might sue. The consent,
> "inherent in the convention," to suit by the United States—at the instance
> and under the control of responsible federal officers—is not consent to suit
> by anyone whom the United States might select; and even consent to suit by
> the United States for a particular person's benefit is not consent to suit by
> that person himself.

501 U.S. at 785 (emphasis in original).

The Eastern District of Texas, in *Sabine Pipe Line, LLC v. A Permanent Easement

of 4.25+/- Acres of Land in Orange Co., Texas*, 327 F.R.D. 131 (E.D. Tex. 2017), provides

a helpful explication of the distinction between the federal government's eminent domain

powers and its Eleventh Amendment exemption. Like this case, *Sabine* involved a

condemnation action by a natural gas company against a state agency pursuant to a grant

of eminent domain under the NGA. The plaintiff argued that, because the federal

government can exercise eminent domain against state land in federal court, so can the

delegee of the government's eminent domain power. *Id*. at 139. Rejecting this contention,

the *Sabine* court observed that the plaintiff was conflating two distinct concepts: (1) the

federal government's power to exercise eminent domain; and (2) its power to sue the states

in federal court. *Id*. at 139-40. Those powers must be treated distinctly because they arise

from different sources. Whereas the power of eminent domain is an implicit attribute of

sovereignty, the power to sue states in federal court is a permission granted to the federal government by the states.[4] *Id.* at 140; *see Alden*, 527 U.S. at 755 (observing that by ratifying the Constitution, the states consented to suits by the federal government).

As discussed above, the Supreme Court in *Blatchford* expressed "doubt" that the federal government's exemption from the state's sovereign immunity "can be delegated," 501 U.S. at 785, and the canon of constitutional avoidance cautions against ignoring the Court's warnings about intruding on this aspect of the states' sovereignty. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) (observing that, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems"). Other courts have concluded, accordingly, that the State's consent to suit is the State's to give or withhold and cannot be conferred by the federal government. *See U.S. v. Tex. Tech Univ.*, 171 F.3d 279, 294 (5th Cir. 1999) ("[T]he United States cannot delegate to non-designated, private individuals its sovereign ability to evade the prohibitions of the Eleventh Amendment."). This Court should reach the same conclusion.

**B.    Congress Has Not Abrogated the State's Sovereign Immunity.**

The statutory basis for Columbia's claim to pursue eminent domain, the NGA, does

---

[4] With little analysis, the United States District Court for the District of New Jersey recently reached the opposite conclusion of the *Sabine* court in an unreported decision; that case is now pending in the Third Circuit Court of Appeals. *See In re Penneast Pipeline, LLC*, Civ. No. 18-1585, 2018 WL 6584893 (D.N.J., Dec. 14, 2018), *appeal filed*, No. 19-1214 (3d Cir., Jan. 11, 2019). The Third Circuit heard argument on June 10, and the audio recording is available at https://www2.ca3.uscourts.gov/oralargument/audio/19-1191InRePennEastPipelineCoLLC.mp3.

not abrogate the states' Eleventh Amendment immunity. An abrogation of a state's immunity requires both a clear statement of congressional intent and a valid exercise of congressional power. *Garrett*, 531 U.S. at 363; *see Lizzi v. Alexander*, 255 F.3d 128, 134 (4th Cir. 2001) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996)), *abrogated in part on other grounds by Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721 (2003). The NGA does not embody a clear statement of congressional intent to abrogate the states' immunity, and it is not a valid source of congressional power for abrogation.

As a preliminary matter, "statutes conferring the right of eminent domain are strictly construed to exclude those rights not expressly granted." *Northern Border Pipeline Co. v. 127.79 Acres of Land*, 520 F. Supp. 170, 172 (D.N.D. 1981) (citation omitted); *accord Transwestern Pipeline Co. v. 17.19 Acres of Prop.*, 550 F.3d 770, 774 (9th Cir. 2008); *East Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 826 (4th Cir. 2004); *Moore v. Equitrans, L.P.*, 49 F. Supp. 3d 456, 474 (N.D.W. Va. 2014). Although the NGA authorizes natural gas companies to acquire property rights "by the exercise of the right of eminent domain in the district court of the United States for the district court in which such property may be located, or in the State courts," 15 U.S.C. § 717f(h), nowhere in this provision, or in other sections of the NGA, does it mention either the Eleventh Amendment or the states' sovereign immunity. *See id.*; *Sabine*, 327 F.R.D. at 141. The NGA's general authorization to file suit is the sort of statutory language that the Supreme Court has held to be insufficient for establishing an intent to abrogate state sovereign immunity. *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985) ("A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh

Amendment."). "Consequently, the court is without the authority to read this exemption into the statute." *Id.* (citing *Blatchford*, 501 U.S. at 786 (refusing to read a delegation of the Eleventh Amendment exemption where the statute did not contain the word "delegation" or "the slightest suggestion of such an analysis")).

In any event, even if Congress had intended to abrogate the states' immunity to suit, the NGA does not provide a valid vehicle for abrogation. The Supreme Court has held that Congress cannot abrogate Eleventh Amendment immunity simply by enacting legislation under its general grant of Article I legislative powers, such as the Commerce Clause. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72-73 (1996) ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction."). The only valid source of Congressional power that would allow for the abrogation of a state's immunity from suit by private citizens is Section 5 of the Fourteenth Amendment.[5] *See Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012). The NGA, however, was enacted pursuant to Congress's Commerce Clause power, not pursuant to the Enforcement Clause. *See* 15 U.S.C. § 717; *Illinois Natural Gas Co. v. Central Ill. Pub. Serv. Co.*, 314 U.S. 498, 506 (1942); *National Steel Corp. v. Long*, 718 F. Supp. 622, 628 n.6 (W.D. Mich. 1989) (discussing *Panhandle E. Pipe Line. Co. v. Michigan Pub. Serv. Comm'n*, 341 U.S. 329,

---

[5] Section 5 of the Fourteenth Amendment—referred to as the Enforcement Clause— states that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5.

344 (1951)).  Consequently, even if it could be argued that Congress intended to abrogate the states' immunity under the NGA, it had no authority to do so.[6]

## II.   THE HARMS COLUMBIA DESCRIBES DO NOT JUSTIFY PRELIMINARY INJUNCTIVE RELIEF.

Columbia argues that it will suffer two types of harm if it is not provided "immediate" access to the pipeline route:  (1) the risk of not being able to meet the July 19, 2020 expiration date in its CPCN ("Certificate Expiry Date"), and (2) the risk of "significant economic harm" and "reputational harm" if it is unable to meet the November 1, 2020 date by which it has contractually committed to begin delivering gas through the pipeline ("In-Service Deadline").  ECF 3 at 8, 12, 13.  As Columbia describes, these types of harm have been found to satisfy the irreparable harm prong for obtaining a preliminary injunction, at least in cases involving the condemnation of private land.  *See, e.g.*, *Mountain Valley Pipeline, LLC v. 5.65 Acres of Land, Owned By Sandra Townes Powell*, 915 F.3d

---

[6] In addition to the State's constitutional objections to this Court's jurisdiction, Columbia has not sufficiently alleged satisfaction of the statutory preconditions for bringing a condemnation action in federal court.  The Natural Gas Act provides that "the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000."  15 U.S.C. § 717f(h).  In its complaint, Columbia does not affirmatively allege satisfaction of that requirement, but states only that, "[u]pon information and belief," the amount "claimed by" the State exceeds $3,000.  ECF 1 at 5 (¶ 22).  However, the appraised value of the easement was only $180, and the $5,000 in compensation that Columbia offered was not the result of a claim by the State, but simply Columbia's effort to expedite conclusion of the easement negotiations.  Although MDNR ultimately recommended approval of the easement for the $5,000 in compensation offered by Columbia, that recommendation was not the result of a claim made by the State.

197, 216-19 (4th Cir. 2019); *see also* ECF 3 at 24 n.3 (collecting cases).[7]  When private

land is at issue, the holder of a valid CPCN unquestionably has the power to condemn, so

denying preliminary relief truly does only "delay the inevitable."  *Columbia Gas*

*Transmission, LLC v. 76 Acres More or Less*, CIV.A ELH-14-0110, 2014 WL 2960836, at

*15 (D. Md. June 27, 2014), *aff'd in part, vacated in part, remanded on other grounds sub*

*nom. Columbia Gas Transmission, LLC v. 76 Acres, More or Less, in Baltimore & Harford*

*Cntys., Maryland*, 701 F. App'x 221 (4th Cir. 2017).  When "[s]uccess on the merits [is]

not only likely but guaranteed," *Mountain Valley*, 915 F.3d at 215, and the only issue at

play is the amount of compensation, the State would agree that the harms Columbia

describes would ordinarily weigh in favor of preliminary relief.  *See id.* at 216-19

(describing cases holding that harms akin to those described by Columbia constitute

irreparable harm).

Here, though, Columbia's power to condemn State-owned public lands through this

proceeding is very much in dispute and, as described more fully above (and in the

memorandum of law accompanying the State's motion to dismiss), that dispute is likely to

be resolved against it.  Under these circumstances and as described below, where there is

---

[7] Although Columbia alleges the same type of harm as was at issue in *Mountain Valley*, on its face, Columbia's situation appears to be distinguishable from Mountain Valley's situation.  In that case, it was undisputed that "Mountain Valley almost certainly would be unable to meet FERC's October 2020 in-service deadline" without the preliminary injunction.  915 F.3d at 216.  But Mountain Valley's condemnation action involved a 303.5-mile pipeline route and "hundreds of landowners," the property of whom would take "three years or more" to condemn.  915 F.3d at 210, 217.  In this case, by contrast, Columbia seeks a single tract from a single landowner along a 3.37-mile section of pipeline.  Compl. ¶¶ 8, 14.

a *sovereign* harm on the other side of the ledger, the harms that Columbia describes do not justify preliminary relief.

## III. THE BALANCE OF EQUITIES FAVORS DENIAL OF PRELIMINARY RELIEF AS THE HARM TO THE STATE'S SOVEREIGNTY FAR OUTWEIGHS THE BUSINESS DISRUPTION THAT COLUMBIA DESCRIBES.

Columbia's argument concerning the balancing of equities misses the mark by disregarding the unique nature of this case—that the property at issue is State-owned. In the typical case, and in all of the cases cited by Columbia, the equities to be balanced are, on the one hand, the pipeline builder's interest in moving forward with the project and, on the other, the landowner's interest in obtaining compensation before disruption of their land. *See, e.g.*, *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004). Because the underlying right to run the pipeline in such cases is typically not at issue, logic usually dictates that the project move forward with compensation determined at a later date.

Here, in contrast, the State's Eleventh Amendment defense against any suit that would compel it to surrender its sovereignty stands on a different footing from the interest at stake in a private-landowner case. "States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today." *Alden*, 527 U.S. at 713; *cf. Maryland v. King*, 567 U.S. 1301, 133 S.Ct. 1, 3 (2012) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)).

The threat to the State's sovereign interests that Columbia's complaint and motion present constitutes irreparable harm to the constitutional framework and Maryland's place within it as a sovereign state. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (observing that a federal regulatory decision that puts state "sovereign interests and public policies at stake" constitutes an irreparable harm). As the Supreme Court has repeatedly observed, "each State is a sovereign entity in our federal system" and "'[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.'" *Seminole Tribe of Florida*, 517 U.S. at 54 (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)). The Court has made it "clear that the Eleventh Amendment reflects 'the fundamental principle of sovereign immunity [that] limits the grant of judicial authority in Art. III.'" *Id.* at 64 (quoting *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 97-98 (1984)). The "indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties," *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc*., 506 U.S. 139, 146 (1993), and "the irreparable harm to state sovereignty and state management of land," *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014), weigh heavily in the type of equitable balancing conducted on a motion for preliminary injunction.

For this Court to grant an injunction allowing Columbia to affirmatively invade State property would constitute not only a harm to the State's sovereign interest, but a quintessential, concrete irreparable harm to its property, one that it would be inequitable for Maryland to bear in advance of a trial on the merits. Once the work is undertaken and completed—and the risks inherent in the project are assumed—it cannot be undone. And

the risks are real; although Columbia presents the project as virtually risk-free, the proceedings before FERC and the Maryland Department of the Environment highlighted the many environmental concerns associated with this project. The high-pressure drilling fluids used in horizontal directional drilling (HDD) always present a risk of "blowout," where "large volumes of drilling fluid" are released causing environmental damage, ECF 1-2 at 12 (¶ 32), particularly when released into "environmentally sensitive areas," *id*. at 13 n.51. Once constructed, the pipeline presents the risk of explosions and leaks that can contaminate groundwater and drinking water wells. ECF 1-2 at 12 (¶ 32). And these risks are all exacerbated by the fact that the pipeline is proposed to run through land marked by the presence of "karst terrain"—a highly erosive geological formation in which sinkholes and groundwater effects are common. *Id.* at 12 n. 42. Finally, these risks are only magnified by the fact that the pipeline would run beneath the Potomac River—a "highly-complex crossing," ECF 3 at 10, where leaks and blowouts could occur upstream of several municipal water supply intakes, including, ultimately, those that supply the Washington D.C. metropolitan area. Although FERC concluded that Columbia had proposed contingency measures that effectively mitigated those risks, ECF 1-2 at 12-13 (¶ 33), they remain a very real aspect of the proposed pipeline.

The Maryland Department of the Environment recognized the risks presented by the project and imposed 23 special conditions designed to mitigate those risks. *See* Maryland Department of the Environment, Nontidal Wetlands and Waterways Permit No. 17-NT-3089) at 3-7 ("MDE Permit," FERC PDF No. 20180316-5122, available on the FERC Docket at https://elibrary.ferc.gov/idmws/file_list.asp?accession_num=20180316-5122).

But FERC declined to incorporate these environmental conditions into its CPCN, despite a request from the Secretary of the Environment that it do so. *See* ECF 1-2 at 35 (¶ 74); Letter from Benjamin Grumbles, Secretary, MDE, to Kimberly D. Bose, Secretary, FERC (March 16, 2018) (available on the FERC Docket with the MDE Permit). Given that "[t]he NGA largely preempts environmental regulation of interstate natural gas pipelines by states," *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 388 (4th Cir. 2018), there is every risk that these environmental concerns will go unaddressed.[8] That, too, weighs heavily against issuance of preliminary relief. *See, e.g.*, *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (mitigating environmental risks is a valid public interest); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (recognizing a well-established public interest in the protection and preservation of nature and the public interest in careful consideration of environmental impacts before major federal projects go forward).

---

[8] FERC included within the CPCN its own environmental restrictions, some of which are like those set forth within the MDE permit. For example, both authorizations include provisions requiring an environmental inspector to be on site during all construction activities. *Compare* MDE Permit at 3 (Spec. Cond. 1) *with* ECF 1-2 at 40-41 (¶ 7). In other respects, however, the CPCN conditions are less rigorous than their Maryland counterparts. *Compare, e.g.*, MDE Permit at 5-6 (Spec. Conds. 15 & 16, requiring Columbia to "replace or repair any wells it damages or degrades" and provide a temporary water supply) *with* ECF 1-2 at 42 (¶ 13, requiring temporary water supply only). In still other respects, the CPCN appears not to contain any analog to the State condition. *See, e.g.*, Ex. MDE Permit at 4 (Spec. Cond. 9, requiring Columbia to notify downstream public drinking water intakes "[i]n the event of an inadvertent release of drilling fluid or pollution event to the Potomac River").

These irreparable sovereign and environmental harms far outweigh the risk of economic harm that Columbia describes. As discussed above, Columbia claims that it will suffer two types of harm if it is not provided preliminary relief: (1) the risk of not being able to meet the July 19, 2020 expiration date in its CPCN, and (2) the risk of "significant economic harm" and "reputational harm" if it is unable to meet the November 1, 2020 date by which it has contractually committed to begin delivering gas through the pipeline. ECF 3 at 8, 12, 13. Although both harms may well qualify as irreparable under Fourth Circuit precedent, neither justifies the issuance of preliminary relief before the State's immunity issue is conclusively adjudicated.

Columbia cites to the risk that litigation-related delays might cause it to miss the expiration date of the CPCN as a potential irreparable harm, and the Fourth Circuit has agreed that that risk would constitute irreparable harm if it would cause Columbia to "lose the right to construct the pipeline altogether." *Mountain Valley*, 915 F.3d at 217. But Columbia's allegation that the pendency of this action is responsible for that risk is belied by its acknowledgement elsewhere in the complaint that it does not have easements for three other publicly owned parcels. ECF 1 at 4 (¶ 14). It is hard to imagine how Columbia's inability to condemn the State's land threatens the harm it alleges when the National Park Service has thus far also declined to convey easements under the parcels it controls.

The fact that Columbia has not yet obtained easements under the Park Service lands also belies Columbia's assertion that it "requires immediate access to and use of the Easement" because it "is an integral portion of the HDD, as the HDD could not be

completed as approved by the FERC Certificate without it." ECF 2 at 2-3; ECF 2-1 at 6-7 (¶¶ 27, 31). The same HDD run that goes beneath the Tract and the Potomac River also goes beneath the Park Service's C&O Canal lands that lie between them. ECF 2 at 3 (stating that the HDD run beneath the Tract also "must pass below the Potomac River"). Given that Columbia concedes that it does not yet have the necessary easements from the Park Service, it is hard to believe that it requires immediate access to the Tract in order to move forward with the project.[9]

Nor is there any indication in Columbia's motion and supporting documentation that the CPCN's expiration date could not be extended. Neither the NGA nor FERC regulations require construction to be completed within two years, or within any other particular time after issuance of a CPCN and order to proceed. *See* 18 C.F.R. § 157.20(b) (providing that project must be completed within "period of time to be specified by the Commission in each order" and requiring the applicant to "notify the Commission" if it is "unable to meet the imposed timetable to commence service"). To the contrary, FERC regulations provide that "the time by which any person is required or allowed to act under any statute, rule, or order may be extended . . . for good cause, upon a motion made before the expiration of the period prescribed or previously extended." 18

---

[9] In fact, in late 2018, Columbia's parent company, TransCanada, requested that FERC issue a Notice of Proceed to commence construction of the project, but specifically excluded from its request the tracts owned by the State and the Park Service. Letter from Robert D. Jackson, TransCanada to Hon. Kimberly D. Bose, Secretary, FERC (Sept. 20, 2108) (FERC PDF No. 20180920-5068, available at https://elibrary.ferc.gov/idmws/file_list.asp?accession_num=20180920-5068).

C.F.R. § 385.2008(a).  In fact, a search of past FERC Orders shows that FERC routinely grants extensions regarding in-service dates to interstate pipeline companies like Columbia.[10]

That leaves the potential for Columbia to suffer economic damages and damages to its business reputation and goodwill if it were unable to meet the deadlines in its contractual obligations to build the pipeline and supply natural gas to its end users.  The potential for that harm, however, is of Columbia's own doing, and "self-inflicted harm is not the type that injunctions are meant to prevent."  *Livonia Properties Holdings, LLC v. 12840-12976 Farmington Rd. Holdings, LLC*, 399 F. App'x 97, 104 (6th Cir. 2010); *see also Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) (stating that preliminary injunctions are not warranted where the moving parties have not "availed themselves of opportunities to avoid the injuries of which they now complain").

The State acknowledges that the Fourth Circuit has reached the opposite conclusion under the Natural Gas Act, stating that a gas company's decision to enter into early contracts is not "self-inflicted" when such early action "is 'encourage[d], if not require[d]'

---

[10] *See, e.g.*, Letter Order Granting Extension of Time to Millennium Pipeline Company, Docket No. CP16-17-000, Accession No. 20171003-3029 (Oct. 3, 2017) (granting a one-year extension due to local permitting issues), available at https://elibrary.ferc.gov/idmws/file_list.asp?document_id=14606646;  Letter Order Granting Extension of Time to Pine Prairie Energy Center, LLC, Docket No. CP11-1-000, Accession No. 20170328-3057 (March 28, 2017) (granting the second of two three-year extensions), available at https://elibrary.ferc.gov/idmws/file_list.asp?document_id=14552490; Letter Order Granting Extension of Time to National Fuel Gas Supply Corporation, Docket No. CP16-37-000, Accession No. 20170223-3002 (Feb. 23, 2017) (granting one-year extension due to local permitting issues), available at https://elibrary.ferc.gov/idmws/file_list.asp?document_id=14541700.

by" the FERC process. *Mountain Valley*, 915 F.3d at 219. And, in the ordinary case, where the company's power to condemn private lands is undisputed, it might well be "'entirely reasonable'" for the gas company to do so. *Id.* (citations omitted). But this is not the ordinary case. As a company routinely engaged in the business of condemning pipeline rights of way, Columbia surely was aware of the obstacle that the State's Eleventh Amendment immunity would present to this suit in federal court—an issue made clear by two recent federal court decisions. *Sabine Pipe Line, LLC v. A Permanent Easement of 4.25+/- Acres of Land in Orange Co., Texas*, 327 F.R.D. 131 (E.D. Tex. 2017); *In re Penneast Pipeline, LLC*, Civ. No. 18-1585, 2018 WL 6584893 (D.N.J., Dec. 14, 2018), *appeal filed*, No. 19-1214 (3d Cir., Jan. 11, 2019). The economic consequences of Columbia's decision to enter into early contracts with subcontractors and customers, and then march into federal court despite the State's immunity, are entirely of Columbia's making. The contrary conclusion is untenable; Columbia surely cannot use its business decisions to leverage the State into a federal forum in violation of its sovereign immunity and the Eleventh Amendment.

## IV. THE PUBLIC INTEREST FAVORS THE DENIAL OF PRELIMINARY RELIEF PENDING RESOLUTION OF THE STATE'S CONSTITUTIONAL OBJECTIONS.

The public interest also requires denial of the preliminary injunction for many of the same reasons. Although the public interest factor typically merges into the balance of the equities when the government is a party, *Connaughton*, 752 F.3d at 766, the public interest factor weighs heavily against injunctive relief when the fundamental structure of our

constitutional system is at stake.  There can hardly be a public interest more solemn than maintaining the constitutional status of states as co-equal sovereigns.

The pipeline project directly contravenes not only the State's sovereignty, but also the State's energy policy.  Maryland has adopted a ban on fracking, Md. Code Ann., Envir. § 14-107.1(b) ("A person may not engage in the hydraulic fracturing of a well for the exploration or production of oil or natural gas in the State."), yet the construction of the pipeline threatens Maryland with many of the same risks to public health that Maryland's ban seeks to avoid.  In addition, the construction of additional infrastructure to support the use and development of fossil fuels runs counter to State policy that seeks to increase renewable energy production and combat climate change.  Md. Code Ann., Pub. Util. §§ 7-701 *et seq.*  And because the pipeline will serve only the interests of the businesses and (possibly) the residents of West Virginia, Maryland citizens would bear the burdens and risks of the planned drilling while enjoying none of the benefits.[11]

It is not surprising, then, that the people of Maryland's statewide-elected Governor and Comptroller and their Treasurer (elected by their legislature stand in unanimous opposition to the disposition of an easement for the pipeline land.  State of Maryland, Board of Public Works, Jan. 2, 2019 Meeting, Transcript at 28-29, *available at* https:// bpw.maryland.gov/MeetingDocs/2019-Jan-2-Transcript.pdf (Governor, Comptroller, and

---

[11] Maryland fully appreciates that the public also has an interest in the orderly development of our Nation's energy infrastructure and, to that end, has approved easements for natural gas pipelines—including ones proposed by Columbia—that more equitably share the benefits and burdens of gas distribution.

Treasurer voting unanimously against approval of easement).  In the same way that a state "'suffers a form of irreparable injury'" whenever its duly enacted statutes are enjoined, *Maryland v. King*, 133 S. Ct. at 3 (citations omitted), the public interest suffers when a federal court countermands the policy choices made "by representatives of [the State's] people," *id*.

\* \* \*

The purpose of a preliminary injunction is to preserve the status quo pending a resolution of the merits.  In this case, the status quo is that no pipeline has been drilled under State land, and none will be unless and until Columbia obtains other properties, namely, the National Park Service easements it has yet to acquire.  Instead, what Columbia seeks is a *mandatory* preliminary injunction—one "that alter[s] rather than preserve[s] the status quo." *Mountain Valley*, 915 F.3d at 216 n.8.  The Fourth Circuit has made clear that mandatory preliminary injunctive relief is "disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994); *see also Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) ("Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief.").  Even in the context of natural gas pipelines, the Fourth Circuit has made clear that mandatory injunctive relief is subject to "more searching" review, *Sage*, 361 F.3d at 830, and is only available "where 'the applicants' right to relief [is] indisputably clear.'" *Mountain Valley*, 915 F.3d at 216 (quoting *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972)).  While a pipeline company's right to condemn easements might well be

"indisputably clear" when measured against the rights of private landholders, that is not the case here, where the State's sovereign rights under the Eleventh Amendment are at stake. At the very least, the State's constitutional argument presents a substantial question that must be resolved before reaching the issue of whether any relief—preliminary or permanent—is warranted.

## CONCLUSION

The plaintiff's motion for preliminary injunction should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

ADAM D. SNYDER, Bar No. 25723
JOHN B. HOWARD, JR., Bar No. 08980
ANN M. SHERIDAN, Bar No. 11137
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
asnyder@oag.state.md.us
jbhoward@oag.state.md.us
asheridan@oag.state.md.us
(410) 576-6398
(410) 576-6955 (facsimile)

</div>

June 17, 2019                    Attorneys for Defendants

## CERTIFICATE OF SERVICE

I certify that, on this 17th day of June, 2019, the foregoing was served by CM/ECF on all registered CMF users.

/s/ Adam D. Snyder
_____

Adam D. Snyder